768 So.2d 853 (2000)
Alexander S. LYONS, Plaintiff-Appellant,
v.
Lesa G. LYONS, Defendant-Appellee.
No. 33237-CA.
Court of Appeal of Louisiana, Second Circuit.
October 10, 2000.
*855 David L. White, Bossier City, Counsel for Appellant.
Alexander S. Lyons, In Proper Person.
James L. Fortson, Jr., Shreveport, Counsel for Appellee.
Before BROWN, WILLIAMS, CARAWAY, KOSTELKA and DREW, JJ.
WILLIAMS, Judge.
The plaintiff, Alexander S. Lyons, appeals the trial court judgment finding the defendant, Lesa G. Lyons, free from fault in the causes giving rise to their divorce. The plaintiff also challenges, as legal error, the date on which the trial court granted the parties' final divorce. For the following reasons, we affirm in part and reverse in part.

FACTS AND PROCEDURAL HISTORY
Alexander ("Alex") and Lesa Lyons were married on September 3, 1983, in Caddo Parish, Louisiana. Two children were born to this marriage, Alexander, born on April 25, 1988, and Nicholas, born on May 14, 1990. On December 29, 1997, the plaintiff filed for divorce, pursuant to LSA-C.C. art. 102, and for determination of incidental matters. In his petition for divorce, the plaintiff urged that the defendant was not free from fault and she was precluded from receiving permanent alimony.
The parties were living together in the matrimonial domicile at the time the plaintiff's divorce petition was filed. Consequently, in response to the plaintiff's petition for divorce, the defendant filed an exception of no cause or right of action. The trial court granted the defendant's exception. The plaintiff applied to this court for supervisory writ. This court reversed the trial court's judgment and remanded the case for further proceedings. Alexander S. Lyons v. Lesa G. Lyons, 31,276-CW (La.App.2d Cir.05/28/98).
On January 8, 1998, the plaintiff filed a supplemental petition in which he alleged that the parties were living separate and apart. He again requested a hearing to determine incidental matters. After the *856 hearing on February 9, 1998, the trial court awarded the defendant child support in the amount of $1,645.00 per month and alimony pendente lite, commencing January 1, 1998, in the amount of $1,362.00 per month.
On August 7, 1998, the defendant, Lesa Lyons, filed a motion for divorce pursuant to LSA-C.C. art. 103. On the same date, the trial court denied the plaintiff's petition for divorce, finding that 180 days had not elapsed since the service of the petition or the execution of a written waiver of service. As a result, the plaintiff again applied to this court for supervisory writ. The plaintiff contended that more than 180 days had elapsed since the defendant orally waived service of process[1] at the hearing to determine incidental matters. This court denied the plaintiff's writ application, finding that an exercise of supervisory review was not warranted and that an adequate remedy was available on appeal. Lyons v. Lyons, 31,789-CW (La.App.2d Cir.09/10/98).
On February 16, 1999, the plaintiff again filed a petition for divorce pursuant to LSA-C.C. art. 102, asserting that 180 days had elapsed since the petition for divorce had been served. On March 19, 1999, a hearing was held on both parties' petitions for divorce and the alimony claims. On July 1, 1999, a judgment was signed granting the plaintiff's divorce pursuant to LSA-C.C. art. 102. The trial court found that the defendant was free from fault in the causes giving rise to the divorce and she was without sufficient means for her support. The plaintiff was ordered to pay the defendant $1,103.09 per month in permanent alimony. The plaintiff appeals.

DISCUSSION

Assignment of Error No. 1
By this assignment, the plaintiff contends the trial court erred in granting the divorce effective July 1, 1999. He argues that the divorce should have been granted prior to that date, or at the latest, on March 19, 1999. The plaintiff asserts that LSA-C.C. art. 102 provides that a court shall grant the divorce upon proof that 180 days have elapsed since the date of the service of the petition. He maintains that he proved his entitlement to a divorce on March 19, 1999, and therefore, the divorce should be effective as of that date. According to the plaintiff, the trial court did not have the discretion to hold the judgment of divorce in abeyance until a hearing on incidental matters was complete. We disagree.
The plaintiff filed his original petition for divorce on December 29, 1997, and a supplemental petition on January 8, 1998. However, the defendant was not served with the petition until August 1998. On February 9, 1998, the defendant made an oral statement waiving service of the divorce petition in open court during the hearing on incidental matters. The plaintiff asserts that the defendant's waiver constitutes a sufficient waiver of service under the law, and therefore, the 180-day time period should have begun on February 9, 1998.
LSA-C.C.P. art. 1201(A) provides, "Citation and service thereof are essential in all civil actions except summary and executory proceedings and divorce actions under Civil Code Article 102. Without them, all proceedings are absolutely null." The Official Revision Comment to Article 1201 states:
The form of initial notice that is required in divorce actions brought under Article 102 is exclusively set forth in LSA-R.S. 13:3491. Often, however, such a divorce action will be accompanied by an ordinary action, such as a claim for partition of community property, *857 that requires service of citation under this Article. In such cases both the notice required by R.S. 13:3491 and the citation required by this Article will have to be served on the defendant, unless those services are waived.
Although citation is not required in a divorce action brought under LSA-C.C. art. 102, the notice requirement established by LSA-R.S. 13:3491 is required. Section 3491 is a more specific requirement for an Article 102 divorce, intended to replace the general citation normally given in civil suits. Kimball v. Kimball, 93-1364 (La.App. 1st Cir. 5/20/94), 637 So.2d 779. Section 3491, entitled "Divorce under Civil Code Article 102; notice of suit," provides:
A. A notice in a divorce action under Civil Code Article 102 must be signed by the clerk of court or his deputy issuing it with an expression of his official capacity under the seal of his office; must be accompanied by a certified copy of the petition, exclusive of exhibits, even if made a part thereof; and must contain the following:
(1) The date of issuance;
(2) The title of the cause;
(3) The name of the person to whom it is addressed;
(4) The title and location of the court issuing it;
. . .
B. The statements required to appear in the notice shall provide substantially as follows:
ATTENTION
YOU ARE BEING SUED FOR DIVORCE BY YOUR SPOUSE. ONE HUNDRED AND EIGHTY DAYS AFTER YOU RECEIVE THIS NOTICE YOUR SPOUSE MAY FILE FOR AND OBTAIN A FINAL DIVORCE. YOU MAY FILE FOR A FINAL DIVORCE YOURSELF, AND YOU MAY SEEK CUSTODY OF CHILDREN, AND MONEY FOR THEIR SUPPORT AND YOUR SUPPORT, AS WELL AS OTHER RELIEF TO PROTECT YOU. IF YOUR SPOUSE FAILS TO FILE FOR A FINAL DIVORCE IN ONE YEAR, HE MAY NOT DO SO WITHOUT FILING NEW PAPERS AND WAITING ANOTHER ONE HUNDRED AND EIGHTY DAYS.
IF YOU ARE UNSURE OF WHAT TO DO AS A RESULT OF THIS NOTICE, YOU SHOULD TALK IMMEDIATELY WITH AN ATTORNEY ABOUT IT."
Notice of suit required by Section 3491 serves as a substitute for citation and, therefore, is essential in a suit for divorce under Article 102. A spouse may waive service of the notice of suit in accordance with the provisions of LSA-C.C.P. art. 3957(A):
A party in a divorce action under Civil Code Article 102 may expressly waive service of the petition and accompanying notice by any written waiver executed after the filing of the petition and made part of the record.
The record reflects that although the plaintiff's original petition was filed on December 29, 1997, the defendant was not served with the petition until August 14, 1998. Therefore, the 180-day time period began on August 14, 1998. On February 16, 1999, the plaintiff filed a rule to show cause why a divorce pursuant to LSA-C.C. art. 102 should not be granted. The trial court fixed the date of the show cause hearing for March 19, 1999.
On the date that the plaintiff filed his rule to show cause, February 16, 1999, the requirements of Article 102 had been met. Thus, the plaintiff is correct in his assertion that he was legally entitled to a divorce on March 19, 1999. See Borel v. Borel, 624 So.2d 1279 (La.App. 3rd Cir. 1993); Lemoine v. Lemoine, 97-1626 (La. App. 3rd Cir. 7/1/98), 715 So.2d 1244. However, the trial court continued the hearing for the completion of the taking of testimony on the incidental matters.
*858 This court has previously found that in the interest of judicial efficiency, district courts should encourage litigants to seek determination of the permanent alimony fault issue at the time when the merits of the divorce are determined and preferably before the divorce is rendered. Jordan v. Jordan, 408 So.2d 952 (La.App. 2d Cir. 1981); McDermott v. McDermott, 32,014 (La.App.2d Cir.6/16/99), 741 So.2d 186. The record reflects that the trial court did not "make the divorce effective" (our emphasis) as of July 1, 1999 as asserted by the plaintiff, but delayed its consideration of the merits of the divorce because the evidence on the issues of fault and permanent alimony had not been concluded. It appears the court based its decision to continue the entire case on its preference to hear the evidence concerning permanent alimony and fault at the same time as the consideration of the merits of the divorce. We find no error in the trial court's decision. Therefore, this assignment of error is without merit.

Assignment of Error No. 2
The plaintiff contends the trial court erred in finding that the defendant was free from fault in causing the divorce, and therefore entitled to permanent alimony.
Alimony after divorce is regulated by LSA-C.C. art. 112(A).[2] The former provisions of this article, which are applicable to an award of permanent alimony in this case, provide that a spouse who "has not been at fault and has not sufficient means for support" may be allowed permanent periodic alimony out of the property and earnings of the other spouse, "which shall not exceed one-third of his or her income."
A spouse seeking permanent alimony must be without fault, and the burden of proof is upon the claimant. Since the statutory law does not specify fault which would deny permanent alimony, legal fault must be determined according to the prior jurisprudential criteria. Allen v. Allen, 94-1090 (La.12/12/94), 648 So.2d 359. Legal fault consists of serious misconduct, which is a cause of the dissolution of the marriage. To be legally at fault, a spouse must be guilty of cruel treatment or excesses which compel a separation because the marriage is insupportable. A spouse who petitions for alimony need not be totally blameless in the marital discord. Only misconduct of a serious nature, providing an independent contributory or proximate cause of the breakup, equates to legal fault. Taylor v. Taylor, 579 So.2d 1142 (La.App. 2d Cir.1991). Such acts are synonymous with the fault grounds that previously entitled a spouse to a separation or divorce. They include adultery, conviction of a felony, habitual intemperance or excess, cruel treatment or outrages, public defamation, abandonment, an attempt on the other's life, status as a fugitive, and intentional non-support. Mayes v. Mayes, 98-2228 (La.App. 1st Cir. 11/5/99), 743 So.2d 1257.
While mere bickering and fussing cannot constitute cruel treatment for purposes of denying alimony, a continued pattern of mental harassment, nagging and griping by one spouse directed at the other can constitute such cruel treatment. Coleman v. Coleman, 541 So.2d 1003 (La.App. 3rd Cir.1989); Minella v. Minella 97-1264 (La.App. 5th Cir. 5/27/98), 713 So.2d 816. Additionally, a party is not deprived of alimony due to a reasonable, justifiable response to the other spouse's initial acts. Taylor v. Taylor, supra.
An association which implies adultery naturally brings on marital discord. Adultery is a serious allegation. It may be established by circumstantial evidence which leads fairly and necessarily to the conclusion that adultery has been committed. The evidence is to be viewed in light of "experiences and observations of *859 life." The fact that a man and a woman are alone together does not necessarily justify presuming that it is for sexual relations. Billingsley v. Billingsley, 618 So.2d 562 (La.App. 2d Cir.1993).
A spouse who perceives infidelity may become quarrelsome or hostile. Such a reasonable reaction does not constitute legal fault. The suspicion of adultery causes the break-up and not the reaction. A spouse who reacts should not be precluded from receiving alimony solely because of his or her response. Allen v. Allen, supra; Brewer v. Brewer, 573 So.2d 467 (La.1991).
The trial court has vast discretion in factual determinations in matters regarding determination of fault for purposes of preclusion from permanent alimony. The trial judge's finding of fact on the issue of fault will not be disturbed unless manifestly erroneous. Coleman v. Coleman, supra; Minella v. Minella, supra.
In the instant case, Alex Lyons contends that there are numerous incidents that support his contention that Lesa Lyons was at fault in causing the dissolution of the marriage. On the other hand, Lesa Lyons asserts that she did not do anything to cause the dissolution of the parties' marriage. According to Lesa, Alex's relationship with Kathleen Grimes, which began in 1994, led to the dissolution of their marriage. However, both parties agreed that problems plaguing their relationship began shortly after they were married. The evidence presented supports the conclusion that, during the course of the marriage, both parties initiated incidents, some more detrimental than others, that adversely affected their relationship.
According to Alex, beginning early in their marriage, he and Lesa argued about almost everything. One incident in particular occurred approximately three years after they were married when Alex's sister and her young son moved in with the couple for a short period of time. According to Alex, as a result of his relationship with his sister, the parties separated for approximately five days and Lesa retained an attorney.
Alex testified that after the birth of their son, Alexander, the couple's relationship became more stressful. He stated they argued about issues concerning child rearing, and these arguments sometimes involved Lesa's parents. Alex testified that Lesa had a very close relationship with her parents and he felt that her parents caused a great deal of stress in their relationship because they were too involved in their marriage. According to Alex, there were occasions when he and Lesa would have arguments and Lesa would contact her parents, who would come over to mediate. Alex complained that Lesa's parents' efforts to mediate sometimes made matters worse.
According to Alex, Lesa constantly complained that he worked too much, did not make enough money, did not spend enough time helping with the children and spent too much time playing softball. He testified that Lesa did not approve of his job and often complained about where he worked. Alex contends that not only did Lesa constantly accuse him of having an extramarital affair with Kathleen Grimes, she also accused him of having a homosexual relationship with her cousin, Donald Wright, Alex's law school roommate. Alex also contends that Lesa often stated that there were other men who wanted her and went further to name certain men whom they knew. Alex testified that Lesa would also profess that she could have any man that she wanted. Alex claims that Lesa belittled him by often remarking that he was ugly, balding and that no one would want him. He testified that Lesa exhibited habitual intemperance which also contributed to the dissolution of their marriage. Alex also testified that there were physical altercations, some which were initiated by Lesa. Alex also testified that after a physical altercation where Lesa struck him in the groin, he put Lesa across *860 his knee and spanked her, striking her approximately three times.
Alex presented the testimony of several witnesses at the trial. Tom Thoma became acquainted with the Lyons because their children attended the same school. Thoma testified that Lesa often came to his apartment in the morning before she picked up Nicholas from school at noon. According to Thoma, although he and Lesa did not have a sexual relationship, she often initiated intimate hugs and kisses. Teresa Fulghum, Alex's secretary, testified that two to three times a week, for a period of more than a year, Lesa called the office to inquire about telephone calls and greeting cards that Alex had received from Kathleen Grimes. According to Fulghum, Lesa stated that she wanted this information because she suspected that Alex and Grimes had a relationship that was more than friendship.
Lesa's father, Eugene Hamner, testified that the parties had never had a good relationship, and that they often argued. He testified that he and Lesa are very close and that during the course of her marriage, he talked to Lesa on the telephone every day, usually in the morning and again in the evening. He also stated that Lesa visited them every Wednesday afternoon. Hamner testified that he and his wife were involved in two incidents where Lesa's mother called the police to the Lyons' residence. He also testified that there were other instances where he and his wife became involved in the parties' relationship.
According to Hamner, one incident involving the police occurred after Alex produced a photograph of a nude female that he allegedly discovered on the Internet. Alex showed the photograph to Lesa and, although the face of the person in the photograph was blacked-out, Alex accused Lesa of being the person in the photograph. An argument ensued, during which, Alex showed the picture to the couple's son, Alexander, and informed him that it was a photograph of his mother. Eventually, Lesa took the photograph to her parents' home to discuss the situation. As a result, Lesa's mother called the police, reported the incident, and later confronted Alex concerning the incident.
Lesa testified that there was one occasion when she heard her son, Alexander, screaming for her from another room. According to Lesa, Alexander told her that Alex had grabbed him and hit him in the back of his head. Lesa then called her mother, who informed Lesa to take care of the child and she would handle the matter. Shortly thereafter, Officer Paula Langford of the Shreveport Police Department arrived and investigated the matter. According to Officer Langford, Alexander informed her that his father instructed him to clean up water that he spilled while playing. After Alexander failed to follow his father's instructions, Alex placed his hand on the child's shoulder to get his attention and, once again, instructed him to clean up the spill. As Alexander turned to clean up the spill, he tripped, fell and hit his head on a table. Officer Langford testified that she examined Alexander and did not find any bruises, marks or swelling. Alexander did not require medical attention.
Lesa testified that Alex was aggressive, controlling, cruel and mean to her. She stated that she was afraid of him the entire time that they were married. She testified that Alex physically and verbally abused her and their children, and he drank excessively. However, Lesa testified that the most extreme thing that Alex ever told her to do was to travel to a pharmacy in Bossier City, Louisiana to have a prescription filled because the pharmacy in Shreveport, where the parties resided, was closed. Alex had received the prescription that night from the emergency room physician who had treated him for an injury he had suffered while playing softball.
Lesa denied any fault in causing the dissolution of their marriage. She testified *861 that she had done everything that she could to salvage the marriage. She denied ever initiating physical confrontations, complaining about Alex's salary, his employers or his physical characteristics. Nevertheless, Lesa admitted that she constantly accused Alex of having an extramarital affair with Kathleen Grimes and that she often discussed her concerns with others, including her mother. She also admitted that she had accused Alex of having a homosexual relationship with her cousin. Lesa testified that she told her husband that she no longer loved him and admitted that she "could have possibly said it on several occasions," but she did not remember. She testified that although they experienced problems in their marriage almost from the beginning, the first time that Alex expressed his desire for a divorce was in June 1997.
There was no evidence presented at trial to prove adultery on the part of Alex. During her testimony, Lesa admitted that she never discovered any credible evidence to support her accusations that Alex was having an extramarital affair with Kathleen Grimes, or that he had engaged in a homosexual relationship with her cousin.
For the most part, the testimony of both parties, as well as their respective witnesses, was contradictory. It is difficult to determine whether most of the complained of conduct actually occurred. Considering the totality of the testimony and circumstances, the record does not reflect any single incident that caused the dissolution of the marriage. The testimony of both parties indicates a fractured relationship characterized by a pattern of mutual harassment. Roussel v. Roussel, 96-682 (La.App. 5th Cir. 1/28/97), 688 So.2d 160.
We are mindful of the discretion afforded the trial court in its factual determinations of these matters. However, our concern is not with the trial court's factual findings, but rather with its legal determination. See Caldwell v. Caldwell, 95-963 (La.App. 5th Cir. 3/13/96), 672 So.2d 944, writ denied, 96-1550 (La.9/27/96), 679 So.2d 1351. We believe that just cause existed for the parties to be held mutually at fault in causing the break-up of the marriage. Consequently, we find that the trial court erred, as a matter of law, in finding Lesa Lyons free from fault in causing the dissolution of the marriage.
Because we have found that the defendant was also legally at fault in causing the dissolution of the marriage, we pretermit a discussion of the plaintiff's remaining assignment of error.

DECREE
For the foregoing reasons, we affirm that part of the trial court's judgment granting the divorce on July 6, 1999. That part of the judgment finding the defendant, Lesa Lyons, free from legal fault in causing the dissolution of the marriage is reversed. Therefore, the award of $1,103.09 as permanent alimony is reversed. In all other respects, the judgment is affirmed. Costs of this appeal are assessed equally to both parties.
AFFIRMED IN PART AND REVERSED IN PART.
CARAWAY, J., dissents with written reasons.
CARAWAY, J., dissenting.
I respectfully dissent.
I have reviewed the testimony, the trial court's lengthy ruling, and the majority's opinion and conclude that resolution of this fact intensive marital dispute required a multitude of credibility calls by the trial court which the majority has now improperly redetermined from the cold record. In its oral ruling, encompassing more than twenty pages of the record, the trial court addressed each allegation regarding fault and made reasonable choices in weighing conflicting evidence which should not be disturbed on appeal. Dismissing the trial court's ruling under the guise of legal error, the majority misses the import of the *862 mixed question of law and fact which the trial court is essentially in the best position to answer.
The trial court properly articulated the appropriate legal standard for "fault" from cases such as Allen v. Allen, 94-1090 (La.12/12/94), 648 So.2d 359. In Allen, unlike this case, the fact finder found the wife's conduct independently egregious. Therefore, in reviewing her conduct, the appellate court was required to accept the conflicting testimony about her misconduct and defer to the trial court's ruling that she acted as badly as the testimony would allow. Nevertheless, the supreme court, bound under that same rule of deference to the fact finder, interpreted the legal standard and found no fault.
This case presents the opposite situation from Allen, which makes the Allen standard for fault even more difficult to overcome. When an appellate court considers the opposing views of the marriage presented by the Lyons, it must accept her word against his regarding the condition of their marriage. From that perspective, the trial court's lengthy review of most of the significant problem areas must be affirmed with the conclusion that Alex precipitated much of his wife's problems. From that view of the facts, I do not see how the Allen court would apply the law of fault and overrule this case. "To constitute fault, a wife's misconduct must not only be of a serious nature but must also be an independent contributory or proximate cause of the separation." See Justice Kimball's concurrence in Allen, supra at 364. The majority has not explained how this test for independent fault may now be overruled by its finding of mutual fault.
As to the analysis of the issue of adultery, proof of adultery is irrelevant. Even so, in every case where adultery is required to be "proven" (as in proof of adultery for divorce), proof is almost always supplied by circumstantial evidence. While the trial court concluded that Alex did not commit adultery, the court also concluded that Alex's admitted platonic relationship with Grimes supplied enough circumstantial evidence for spousal concern. "An association which implies adultery naturally brings on marital discord. A spouse who perceives infidelity may become quarrelsome or hostile. Such a reasonable reaction does not constitute legal fault." Allen at 362. Was it reasonable for the trial court to conclude that Lesa's conclusions were reasonable? I think so. The evidence most favorable to Lesa shows that she complained of the Grimes affair to Alex early on. Regardless of his innocence, he continued to allow for the implication of adultery which his wife could not handle.
NOTES
[1] Prior to the taking of evidence at the hearing to determine incidental matters, the defendant's counsel informed the court that he was never served with a copy of the plaintiff's divorce petition that was filed on December 29, 1997. He further stated, "I waive service on the petition absolutely, and the amended petition. We waive service on all of that."
[2] LSA-C.C. art. 112(A) was amended by Acts 1997, No. 1078, § 1. The amendment is not applicable to this case because it did not become effective until January 1998 and does not apply to actions commenced before that date.