882 So.2d 705 (2004)
Brenda JENKINS, Nee Eldridge, Plaintiff-Appellee
v.
Frank JENKINS, Defendant-Appellant.
No. 38,873-CA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 2004.
*707 Blackwell, Chambliss, Henry, Caldwell, Cagle & Camp, LLP, by Sam O. Henry, III, West Monroe, for Appellant.
Linda K. Ewbank, for Appellee.
Before PEATROSS, MOORE and LOLLEY, JJ.
MOORE, J.
Plaintiff moved out of the matrimonial domicile and filed for a divorce, ending her 19-year marriage to defendant. She petitioned for interim and permanent spousal support. Divorce was granted on December 12, 2002, while issues regarding a claim for past due interim support and permanent support were still pending. After trial on these issues, the court awarded the plaintiff $700 per month permanent support, but denied her motion for past due interim support. Defendant appeals the judgment awarding the plaintiff permanent support and the amount of support. Plaintiff answers the appeal, seeking an increased award and past due interim support. For the reasons that follow, we affirm.

FACTS
Frank Jenkins and Brenda Eldridge were married on September 16, 1983  his fourth and her first, although two of Frank's marriages were to the same woman. At the time Frank married Brenda, he had two sons, ages 19 and 17, and a daughter, Lindsey, age 2, from his previous marriage to Judy Bennett Jenkins. Frank had custody of Lindsey every other weekend.
The couple lived in a home in Indian Lake subdivision in West Monroe, Ouachita Parish. Frank also owns a camp in East Carroll Parish bordering the Mississippi River, where he spent nearly every weekend. Frank retired some years back, but owns and manages a mobile home park consisting of roughly 95 lots which he rents monthly for approximately $150 per month and which generates approximately $12,000 per month before operating expenses are deducted. Frank testified, however, that he actually has a negative income because he borrows his living expenses against the mobile home park each year.
The first signs of marital discord occurred near the end of the summer of 2000 when Brenda moved out of the house on August 29. She filed for a divorce on September 20, 2000, but the couple reconciled in January, 2001 after being separated for approximately five months. As part of their agreement to reconcile, Brenda signed a partition agreement waiving any future right to alimony and the home in exchange for $50,000, which was never *708 paid.[1] One year later, on March 21, 2002, Brenda moved out again and filed for divorce on April 15, 2002. She sought interim and permanent spousal support.
The court awarded Brenda interim support on November 20, 2002 in the amount of $2000 per month. Frank moved for a rehearing which was scheduled for December 12, 2002. Judgment of divorce was granted at the December 12 hearing, and subsequently the court reduced the support award to $1269 commencing on April 15, 2002.
On April 28, 2003, Brenda filed a rule for back due interim support in the amount of $2,538.00. This sum allegedly represented two missed payments of $1269 for April 15, 2002 and April 15, 2003. Defendant also requested attorney fees and costs.
Trial on all pending motions was held on October 8 and 10, 2003. The court took the matter under advisement and rendered judgment without separate written reasons on November 4, 2003. The judgment found that Brenda was without fault in the divorce and awarded her permanent periodic spousal support in the amount of $700 per month. The court denied all other motions.
Frank now appeals alleging that the court erred in finding that Brenda was without fault. Alternatively, Frank argues that if the court affirms the spousal support award, the award should be reduced.
Brenda answered the appeal alleging that the award is far too low. She contends the award does not consider her needs, Frank's ability to pay, the lifestyle of the parties who were married for 19 years, and their respective earning capacities. She contends that the award should be $1780 per month, or alternatively, the same amount as the interim award of $1269.
Brenda also contends that the court erred in denying her interim spousal support arrearage amounting to $3,807, plus interest, in addition to attorney fees and costs.

DISCUSSION
The court issued a "ruling and judgment," stating that it rendered judgment based upon consideration of the law, testimony and documentary evidence. The trial judge assigned no separate oral or written reasons for judgment detailing the factual basis for ruling that Brenda Jenkins was without fault in the dissolution of the marriage and the factual basis for awarding her $700 per month permanent alimony, while denying all other requests for relief. Had the trial court assigned clearly stated findings of fact and reasons for judgment, the reviewing court could more easily follow the trial court's reasons for finding that Brenda was without fault, and its reasons for setting the support amount at $700 per month, and why Brenda's motion for past interim support was denied.[2]

Fault
By his first assignment, Frank contends the trial court erred in finding that Brenda was free from fault. Frank alleges that Brenda abandoned him in March of 2002 when she moved out of the matrimonial *709 domicile without lawful cause and refused to return. This abandonment, he argues, constitutes legal fault and precludes an award of permanent spousal support.
Fault is a threshold issue in a claim for spousal support. Roan v. Roan, 38,383 (La.App. 2 Cir. 4/14/04),870 So.2d 626. In a proceeding for divorce or thereafter, the court may award interim periodic support to a party or may award final periodic support to a party free from fault prior to the filing of a proceeding to terminate the marriage, based on the needs of that party and the ability of the other party to pay. La. C.C. art. 111. The burden of proof is upon the claimant. Id; Lyons v. Lyons, 33,237 (La.App. 2 Cir. 10/10/00), 768 So.2d 853, writ denied, XXXX-XXXX (La.1/5/01), 778 So.2d 1142.
Revision Comment (c) of 1997 to La. C.C. art. 111 notes that fault continues to mean misconduct that rises to the level of one of the previously existing fault grounds for legal separation or divorce. Jones v. Jones, 35,502 (La.App. 2 Cir. 12/5/01),804 So.2d 161; Allen v. Allen, 94-1090 (La.12/12/94), 648 So.2d 359. Legal fault may include, among other actions, habitual intemperance or excesses, cruel treatment or outrages, and abandonment. Roan v. Roan, supra; Mayes v. Mayes, 98-2228 (La.App. 1 Cir. 11/5/99), 743 So.2d 1257, 1259. A spouse who petitions for permanent support need not be totally blameless in the marital discord. Only misconduct of a serious nature, providing an independent contributory or proximate cause of the breakup, equates to legal fault. Roan v. Roan, supra; Lyons v. Lyons, supra.
Frank contends that Brenda was totally at fault in the dissolution of the 19-year marriage, and that he was without fault. Brenda abandoned him when she moved out of the matrimonial domicile and refused to return. This abandonment, he argues, caused the dissolution of the marriage.
Abandonment was a ground for separation under former La. C.C. art. 138, and still constitutes legal fault for the purpose of preclusion of a party from permanent spousal support. Roan, supra; Caldwell v. Caldwell, 95-963 (La.App. 5 Cir. 3/13/96), 672 So.2d 944, writ denied 96-1550 (La.9/27/96) 679 So.2d 1351. The elements necessary to prove abandonment as provided in the former code articles are:
1. the party has withdrawn from the common dwelling;
2. the party left without lawful cause or justification; and
3. the party has constantly refused to return to live with the other.
It is undisputed that Brenda moved out of the matrimonial domicile, and she had no plans to return. She testified as much. Frank testified that on one occasion he suggested that she return home and be a "decent wife." On the other hand, he also admitted at trial that he once told his former brother-in-law, whose wife (Brenda's sister) had also left him, that they may find that it's better that "the bitches are gone."[3] Notwithstanding this remark, if we assume that Brenda refused to return, the sole question regarding the issue of abandonment is whether Brenda had lawful cause for leaving.

Lawful Cause
Brenda alleged in her petition and testified at trial that the cause of the physical *710 separation and divorce was Frank's excessive drinking, which she said led to physical and verbal abuse directed at her. She testified his drinking began every afternoon around 2:00 o' clock at the trailer park with his brother L.C., and by the time Frank came home around 5:30 or 6:00, there was a personality change. He would have an additional three or four more drinks after he came home. She said when he was drinking, Frank verbally degraded her, accused her of infidelity, called her a "fucking bitch," and told her she could "carry her ass" if she did not like it. She testified that he pulled her hair and pinched her. On one occasion, she said he grabbed her hair and twisted her arm behind her back when she tried to walk away from him after they had been arguing about alcohol.
Brenda admitted that she sometimes drank two or three cocktails when they were at a party or holiday occasion, but denied that she drank excessively or ever became obnoxious from drinking. She said that she sometimes would go weeks without drinking, and has never drunk alcohol on a daily basis. She admitted that she received a DWI when she was a teenager.
Frank denied that he drank excessively or ever abused Brenda. He admitted that he drank two or three cocktails each evening during the marriage, but claimed that Brenda matched him drink for drink. Frank said that toward the end of the marriage, Brenda became very cold towards him and then left him without any reason. He says he was never physically or verbally abusive to Brenda.
Both parties tried to corroborate their testimony with testimony of friends and relatives:
Russell Fleeman, Brenda and Frank's one-time brother-in-law married to Brenda's sister, testified that he never saw Brenda drink in excess or act obnoxiously or rudely. Regarding Frank's statement to him after their wives had left them, he quoted Frank as saying, "I don't give a fuck what's happened to the bitches." He said that although he observed Frank in social settings, he was not measuring what Frank drank. He never observed Frank abusing Brenda.
Terry Jenkins, Frank's daughter-in-law by marriage to Frank's son, Vance, testified that she had never seen Brenda drink to excess or to the point that she was impaired. On the other hand, she stated that she and her husband no longer have a relationship with Frank because of his drinking. Nor do they allow Frank to have a relationship with his grandchildren. She has observed Frank drunk and using vulgar language. She does not allow her children to visit or stay with Frank because of his excessive drinking. When the couple was married, she only allowed the kids to go to the camp when Brenda was there because Brenda would not be drinking. Prior to the separation and divorce, she and her husband visited on holiday occasions. She admitted that her relationship with Frank, as well as Vance's, relationship with him, was strained due to Frank's drinking. She said Vance told her that Frank once offered to build him a house and take the kids from her if he would "divorce the bitch."
Lisa Ginn, Brenda's sister, testified that she has seen Brenda drink on occasions but never to excess. However, she has observed Frank drink excessively at the camp and saw him stumble and fall at the camp on Labor Day three years earlier from drunkenness. She has heard Frank verbally abuse Brenda. She said she called in January of 2002 and asked if Brenda was there. She testified that Frank responded by saying, "She's here. I'm looking at the bitch." She said Frank *711 made crude comments, and recalled one such particularly gross comment he made to her pregnant daughter.
Other evidence of Frank's behavior was introduced in the record, including the pleadings in the divorce filed by his former wife, Judy Bennett Jenkins and also an incident at the trailer park involving the police. The former divorce pleadings contained allegations against Frank of behavior similar to the allegations by Brenda, namely, that Frank accused Judy of infidelity, of pulling her hair, and using degrading and abusive language to her. Ouachita Parish Sheriff's deputy James Hindmon testified that in August of 2002, he was called out to investigate an alleged battery committed by Frank Jenkins on a juvenile, and in which his report indicated that he, Hindmon, detected the smell of alcohol on Frank. The deputy recalled that he detected a strong smell of alcohol coming from Frank and from his brother L.C., when he interviewed each of them. He did not perform an intoxication test, but he observed that Frank had "glassy, watery eyes." No arrests, however, resulted from the investigation.
Judy Bennett Jenkins was married to Frank twice[4] and is the mother of Lindsey. Judy testified that Frank used abusive language toward her during her marriages to Frank in the late seventies. She stated that the allegations in her divorce pleadings that Frank had accused her of infidelity were true. Although she remembered that Frank drank, she could not remember if he drank every night. Judy also testified that Brenda once called her and accused her of lying about the allegations that Frank had abused her and told her that Frank was a wonderful husband and had never done anything like that.
Lindsey Jenkins testified that her father only drank socially in the evening, and said Brenda drank with him. She said that she had seen Brenda mock her father and recalled a few incidents in which Brenda hurt her feelings when she was a child. She also said she heard Brenda speak badly about her father. Lindsey admitted that she was financially dependent on her father.
L.C. Jenkins testified that he lives in the trailer park owned by his brother. He said that normally they would not drink until after working hours at 5:00. He said that he saw Brenda consuming alcohol on the same occasions that he saw Frank drinking and never saw them together in which she was not drinking along with Frank. He testified that he never saw Frank speak or act abusively toward Brenda.
Glinda Jenkins, L.C.'s wife, corroborated much of L.C.'s testimony. She said that Frank and Brenda had engaged in social drinking together for as long as she had known them and had never observed Frank being abusive toward Brenda.
Ray Jenkins, another brother of Frank Jenkins said he had observed Frank and Brenda drink socially. He had never seen Frank verbally or physically abuse Brenda on the occasions that he visited their home.
Lane Jenkins, one of Frank's sons who also lived in the trailer park, testified that he had never seen or heard his father physically or verbally abuse Brenda. He said that alcohol consumption was only socially in the evening, and Frank and Brenda both participated. Lane also contradicted Terry Jenkins' testimony that they did not have alcohol in their home.
Several of the above witnesses testified that Brenda spent a minimal amount of *712 time with Frank during his hospital recuperation lasting several days.
To justify or establish lawful cause for leaving the common dwelling, the withdrawing spouse must make a showing which is substantially equivalent to a cause giving rise to grounds for separation under the former LSA-C.C. art. 138. Caldwell v. Caldwell, supra. See Prattini v. Prattini, 543 So.2d 590 (La.App. 4 Cir.1989). Habitual intemperance or excesses, cruel treatment or outrages were included among the causes serving as "fault" grounds for separation under former Article 138.
It is well-settled that it is not the quantity of alcohol but rather the extent and habitualness of intoxication that constitutes "habitual intemperance" for purposes of "fault." Proof of intoxication on two or three occasions does not establish habitual intemperance. Broderick v. Broderick, 191 La. 492, 186 So. 5 (La.1938); Williams v. Williams, 240 So.2d 795 (La.App. 2 Cir.1970), writ refused, 257 La. 279, 242 So.2d 248 (La.1971). In Broderick, Chief Justice O'Niell stated that
habitual intemperance  like ill-treatment of one of the spouses toward the other  is not a just cause for a separation from bed and board unless such habitual intemperance, or such ill treatment, is of such a nature as to render their living together insupportable. And the question whether the habitual intemperance, or ill-treatment, in any given case, is of such a nature as to render the living together of the parties to the marriage unbearable,  or `insupportable' ...  is a question for the Court, and not for either of the parties to decide. Mack v. Handy, 39 La. Ann. 491, 2 So. 181. In deciding that question, in any given case, the court must consider the habits of the complaining party, and his or her conduct towards the other party to the marriage. 186 So. at 6.
Regarding acts of cruelty, it has been held that where the conduct of a spouse is calculated permanently to destroy the peace of mind and happiness of the other so as to utterly destroy the objects of matrimony, a judgment of separation may be granted on grounds of cruelty. Williams v. Williams, supra. Swartz v. Swartz, 191 So.2d 753 (La.App. 2d Cir.1966).
The trial court in this case did not state for the record the factual determinations and credibility determinations upon which it based its conclusion that Brenda was not at fault and therefore implicitly finding that she was justified in leaving the house. Nevertheless, we conclude that the trial court must have found that Brenda had just cause for moving out of the matrimonial domicile based upon Frank's habitually excessive drinking and abusive language toward Brenda. The testimony supports a finding that Brenda drank on occasion with Frank, but not to excess and not with the same resultant personality change Frank underwent when he continued to drink. Brenda apparently complained to Frank about the excessive drinking to no avail, and it is obvious he does not believe he has a drinking problem. Frank's habitual, excessive consumption of alcohol followed by abusive language toward his wife seemed calculated to utterly destroy Brenda's peace of mind and happiness rendering the marriage unsupportable. For this reason, we conclude that the trial court did not err in finding that Brenda was without fault in the dissolution of the marriage.

Mutual Fault
Alternatively, Frank argues that both parties were mutually at fault since Brenda drank just as much as he did. Lyons v. Lyons, supra. However, this argument is without merit. A course of *713 conduct, such as drinking, when it is approved and consented to by both spouses, cannot constitute mutual fault. Rittiner v. Sinclair, 374 So.2d 680 (La.App. 4 Cir.1978); Denbo v. Denbo, 345 So.2d 1257 (La.App. 1 Cir.1977).

Amount of Spousal Support
Frank argues that the permanent spousal support award is too high. Frank is 60 years old. He retired from his engineering practice at age 45 and worked as a developer building "spec" houses. In fact, Brenda handled the decorating end of these projects. He recently had two back surgeries. His sole means of support is from the trailer park he owns. He contends he is deeply in debt and he desires to send his adult daughter Lindsey, who is a nurse, to graduate school as a nurse practitioner.
He contends the $700 per month award exceeds one-third of his income because his accountant said his income is in a "negative position." He allegedly lives and supports his daughter by borrowing money, and he contends he should not be required to borrow money for spousal support.
Brenda notes that Frank owns and lives in a large home and has a comfortable camp. She contends he makes ample money from his trailer park to generously support himself and provide living expenses for his adult daughter Lindsey and her fiance. Since her graduation from high school, Frank has bought Lindsey three homes and has given her five automobiles since she began driving, the most recent being a brand new GMC Denali. Brenda contends that she was economically dependent on Frank during their 19-year marriage. She earns only $1248.25 per month working in a doctor's office while her living expenses are $3,208.33. Accordingly, she argues the $700 is simply not enough.
Brenda also argues that the court erred in denying her motion for past due interim support in the amount of $3807, which comes to three payments of $1269, the court-awarded monthly interim support award. She contends that Frank never paid the first half-month of interim spousal support award based on the $1269 award, which comes to $634.50, and he never paid the final half-month for June 2003. He apparently missed two other payments according to Brenda.
Brenda also requests interest and attorney fees for the past due interim support amounts.
In this instance, it is clear that Frank owns a considerable amount of property and has a large cash flow income from his mobile home park, notwithstanding his "debt" on the park. The record also supports the conclusion that Frank lavishly spends money on his daughter Lindsey, and has supported directly and indirectly other members of his family.
Brenda has worked most of the 19 years of marriage in support of the marriage. There is really no evidence other than Frank's testimony that she spent money selfishly during the years of marriage.
We conclude that while the permanent spousal support award of $700 per month is very low, considering the relative earning strength of Frank and the assets involved, we cannot conclude that the trial court abused its discretion in determining the amount of the award and, therefore, the award will not be disturbed on appeal.
Likewise, we cannot conclude, based on this record, that the trial court erred in denying Brenda's motion for past due interim support.

*714 Conclusion
We conclude that the judgment of the trial court is supported by the evidence contained in the record. For these reasons, the judgment is affirmed at appellant's cost.
NOTES
[1] The validity of the partition agreement is not an issue in this proceeding.
[2] Formerly, Article VII, § 43 of the Louisiana Constitution of 1921 required a district judge in all contested civil cases, other than jury cases, to give in writing his findings of fact and reasons for judgment. However, the Louisiana Constitution of 1974 does not contain a similar provision. La. C.C.P. art.1917 requires a court to give written reasons for judgment when requested by one of the parties in the action.
[3] Brenda's version of this statement is somewhat different. She testified that Frank did not want her to return home and, in fact, told his brother-in-law that he was glad that "the bitches were gone."
[4] Frank testified that he gave Judy a "second chance."