HAMITER, Justice.
 

 Ernest R. Ratcliff, a resident of Caddo Parish, departed this life on October. 6, 1943, leaving as his widow in community Mrs. Helen L. Ratcliff, to whom he was married on November 9,
 
 1937
 
 (his third wife). Of this union there was no issue; however, of each of his two previous marriages a child survived, Mrs. Bessie R. Gray, who was born of the first, being one of the ■children.
 

 The last will and testament of decedent, dated September 28, 1943, directed that his ■estate be administered by J. E. Webb (his secretary and bookkeeper) and B. H. Gray (his son-in-law and the husband of Mrs. Bessie R. Gray), they to serve without bond •or other security; but in such instrument he made no disposition of his property. These persons, after being recognized and confirmed as testamentary executors by order ■of court, proceeded to administer both the separate and community estates. In due course, but following the .occurrence of •considerable litigation between them and the widow, the executors filed their first annual account, and later they supplemented and enlarged it with a written report prepared by Messrs. Frost and Heard, accountants and auditors, listing the assets'and liabilities and the receipts and disbursements of the separate and community estates.
 

 To the account as supplemented, Mrs. Helen L. Ratcliff, the widow in community, filed oppositions, she opposing it generally and also opposing many of the items thereon specifically.
 

 The district court, after a regular hearing, ruled in favor of the widow on many of her oppositions to specific items. Thereupon the executors appealed from some of the rulings, and the widow has answered the appeal' praying for a reversal of certain holdings of the court that were unfavorable to her.
 

 First to be considered herein are the complaints of the executors regarding four rulings sustaining oppositions of the widow. Thereafter, we shall pass upon the widow’s protests to the overruling of two of her urged objections.
 

 In the capacity of president of the Hercules Gasoline Company Mr. Ratcliff received a monthly salary of $4,166.66, After his death, which occurred October 6, 1943, the company sent to the executors a salary check for the entire month of October, amounting, after the deducting of the withholding (income) tax, to the sum of $3,359.33. Since decedent had been employed for only six days in that thirty-one day month, the executors prorated the pro-, ceeds of the check in the proportion of 6/31 to the community and 25/31 to the separate estate, they taking the position that the six days’ salary actually earned belonged to the community, and that the balance, constituting a gift made to the executors, inured to the separate estate. The widow, under her opposition that was sustained, shows
 
 *229
 
 that the whole payment was for salary — no portion being a gratuity, bonus or donation —and as such it represented community compensation.
 

 In support of their position the executors rely on Blair v. Rosseter, 9 Cir., 33 F.2d 286; Bogardus v. Commissioner of Internal Revenue, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32; and Succession of Goll, 156 La. 910, 101 So. 263.
 

 Clearly the Federal decisions are inapplicable. In each of them the payment involved was unquestionably a gift; it was so denominated by the donor. Here, however, the check obviously was given solely in payment of salary; no part of it was intended or treated as a gift by the Hercules Gasoline Company. It was in the same amount as other salary checks received by decedent. Moreover, the withholding (income) tax was deducted from the whole month’s salary, not from merely a 6/31 thereof. Had the 25/31 portion constituted a gift, as the executors contend, it would not have been subject to that tax.
 

 Neither is the cited Succession of Goll case applicable, .for it deals with the matter of the ownership of rents accruing from real estate after the dissolution of the community. Therein this court properly observed that, “The rents collected after the community was dissolved by the death of Goll belonged to the owners of the property that produced the rents, in proportion to each owner’s interest in the property.”
 

 In the written reasons for judgment assigned in the instant case by the trial judge, the following appropriate comment, with which we thoroughly agree, is offered:
 

 “They [Hercules Gasoline Company] chose to pay him [decedent] a full month’s salary for six days’ work. If the executors are not willing to accept it as such the unearned portion should be returned to the company as paid in error. There is no basis for allocating it to his separate estate. The sum of $2,687.46 must be added to the community receipts for 1943.” (Brackets ours.)
 

 The widow’s opposition to the discussed salary allocation, in our opinion, was correctly sustained.
 

 The executors, appellants herein, next contend that the district court erred in holding, as the widow urged, that the profits of the separate estate which belong and go to the community must be calculated without regard to the actual depreciation of decedent’s individual property. In making this contention they recognize that the present jurisprudence announces a contrary view, it being that the community owes no recompense for, the diminution in value of the effects of the husband or wife by reason of the community’s enjoyment thereof, Depas v. Riez, 2 La.Ann. 30, and Succession of Viaud, 11 La.Ann. 297; but they insist that the jurisprudence on that proposition should be changed. In this connection it is. argued that depreciation is an actual, a continuing, loss; that it is universally recognized in sound accounting practice and in law as being something that must be taken into account in order to determine what profit is made from the use of the property;, and that both the state and federal governments allow reasonable deductions for depreciation as a credit against the income of the owner of the property.
 

 
 *231
 
 If the suggested change in our jurisprudence is warranted (this we do not concede), it does not appear that it can be effected in this controversy, because there is no proof in the record disclosing actual depreciation of the property involved.
 

 A specific depreciation item of $8,537.50, which the district court held to have been erroneously charged by the executors to the community, relates to certain commercial partnership ventures in which decedent was interested. When married to opponent herein, he was a partner in two concerns. During the existence of the marriage his net revenues therefrom were properly treated as a community income. But in determining the amount of such net revenues or profit the executors deducted from the partnerships’ gross income depreciation on their immovable properties. In opposing the deduction, and maintaining that the community owes no recompense for the diminution in the value of the effects of the husband, the widow shows that under the jurisprudence of this state and Revised Civil Code, Article 2825, the partners of a commercial partnership are the joint owners of all real estate bought for or by the firm. This principle of law is conceded by the executors. But they maintain that it is purely a legal fiction; that a partnership is a separate entity, something altogether different from its members; and that a partner’s profit is his portion of the partnership income after all expenses and losses, including depreciation of its properties, have been deducted.
 

 As above pointed out, the record of this case fails to show actual depreciation of any of the properties in which decedent was interested; hence we do not feel justified in passing upon the legal question, thus presented. Accordingly, it must be held that the opposition to the instant partnership item was correctly sustained. , .
 

 Another opposition of appellee decided favorably to her, to the ruling on which appellants offer complaint here, relates to an item of $35,500 charged by the executors against the community receipts under the heading of “interest paid.” This sum represents disbursements made by decedent to his second wife, Mrs. Ruby Moss Ratcliff, during the existence of the community between him and opponent, all in keeping with and as a result of the following described contract.
 

 On July 14, 1937, shortly before his marriage to appellee and opponent (his third wife), decedent entered into a written agreement with his mentioned second wife to effect a division or settlement of the community property that had been acquired during their marriage. In it he obligated himself to convey to her his interest in their home (property valued at $75,000), as well as in the furniture situated therein, and agreed to pay all debts of that community. Additionally decedent (known in such contract as first party) bound himself in favor of his second wife (termed second party) as follows:
 

 “In lieu and instead of a partition in kind or by licitation of the remainder of the community property held in joint ownership by the parties hereto, under the laws of the State of Louisiana, first party agrees, in addition to the other obligations assumed by
 
 *233
 
 him in this contract, to pay to second party an annuity in the sum of Five Hundred Dollars ($500.00) per month, to be paid on the 1st day of each calendar month beginning at the date of this contract, said annuity to be governed by the laws of the State of Louisiana and particularly Articles 2793 to 2800 respectively of the Louisiana Revised Civil Code. And for the purposes of this agreement, it is understood and agreed that said annuity shall represent a principal sum of One Hundred and Twenty Thousand Dollars ($120,000.00). Said annuity shall be paid at all times during the life time of the first party to the second party, her heirs, successors or assigns, and in the event of the death of first party, shall be chargeable against his estate in the amount of said principal sum, plus any annuity payments or other debts that may be due second party, to be paid in due course of administration of first party’s estate.
 

 “If first party should fail in business, or should become bankrupt, or should have filed against him proceedings in involuntary bankruptcy or for the appointment of a receiver, or should acknowledge in writing his inability to pay his debts as they become •due, or should fail to pay premiums on the life insurance described in Paragraph VI hereof, then the said principal debt of One Hundred and Twenty Thousand Dollars ($120,000.00) and all other debts and obligations undertaken by first party under this contract shall immediately become due .and exigible.
 

 “Likewise, if at any time more than three •(3) monthly installments of the annuity provided for herein should be past due and unpaid, second party may, at her option, demand full payment of said principal debt of One Hundred and Twenty Thousand Dollars ($120,000.00) and the fulfillment of all other obligations assumed herein by first party.
 

 * * * * * *
 

 “First party will, when able to do so, pay to second party in full the principal debt of One Hundred and Twenty Thousand Dollars ($120,000.00) referred to hereinabove, but first party’s ability to make such payment shall rest entirely in his discretion. If and when said principal debt is paid in full, the monthly payments provided for herein shall cease and first party’s obligation to maintain insurance on his life in favor of second party shall likewise cease and second party shall assign, release and convey to first party any and all of her rights, title and interest in said insurance. If first party should make a part payment on said principal debt at any time, then his obligation to make monthly annuity payments, provided for herein, shall be proportionately reduced in the ratio that said part-payment bears to the total debt of $120,-000.00, but second party shall have the option of accepting or refusing any part payment on said debt. There shall be no reduction in the amount of life insurance to be maintained by first party, as provided in paragraph VI hereof, by any part-payment of said principal sum, unless and until said life insurance áhall exceed any balance due on said principal debt.”
 

 The contract also provided, as is indicated in the quoted extracts, that payment of
 
 *235
 
 the principal debt of $120,000 would be adequately secured by policies of insurance on decedent’s life.
 

 On October 1, 1937, decedent and his second wife stipulated in writing that deeds had been executed in accordance with their previous agreement (dated July 14, 1937) for the settlement of the community property owned by them, and that in consideration of the terms and conditions of the contract she “has quitclaimed, conveyed and delivered and does by these presents quitclaim, convey and deliver unto Ernest R. Ratcliff any and all right, title and interest which she may have or be entitled to claim in and to all of the stocks, bonds, notes, credits, and other personal property now in the possession and in the name of Ernest R. Ratcliff.”
 

 Constituting the disputed item of $35,500, as pointed out above, are numerous disbursements of the contracted $500 monthly annuity that were made to the second wife during the existence of the community between decedent and appellee. The latter contends that since the indebtedness under the contract was incurred prior to her marriage with decedent it was chargeable against the corpus of his separate estate and should not be deducted from the income of that estate, which income belongs to the community between herself and the decedent. The executors take the position that the contracted annuity was a charge upon decedent’s separate estate which was required to be paid out of its large gross revenues before there would or could be any profits of such separate estate to be enjoyed by the community.
 

 According to Revised Civil Code, Article 2793, being one of the codal provisions mentioned in the contract as governing the annuity payments, “The contract of annuity is that by which one party delivers to another a sum of money, and agrees not to reclaim it so long as the receiver pays the rent agreed upon.” When the above quoted contractual provisions are considered in the light of that governing definition it is apparent that the mentioned settlement (except as concerned the. home and furnishings) amounted to a conveyance by the second wife to decedent of all of her interest in their community property for an agreed consideration of $120,000. Since decedent could not pay the sum in cash, however, the parties decided on a credit transaction by which that purchase price would be paid at an indefinite time, would bear a rent or interest or annuity charge of $500 per month payable monthly in advance, and payment of the agreed consideration would be secured by policies of insurance on decedent’s life, the rent or interest charge to be reduced proportionately on the making of part payments on the principal debt and to cease entirely on the complete liquidation of that indebtedness. In other words the second wife merely sold to decedent her property on terms of credit, with ample security, for an agreed purchase price of $120,000, that consideration being due at vendee’s discretion and bearing 5% per annum interest, payable monthly, from date until paid, such interest being in the nature of an annuity or rent on the unpaid price.
 

 The described credit transaction, as before stated, occurred prior to the mar
 
 *237
 
 riage of decedent and appellee; hence the obligation to pay the discussed- annuity or interest or rent charge was that of his separate estate. The executors concede this to be correct. But they contend that the revenues of the separate estate, which greatly exceeded the total disbursements for the contracted annuity ($35,500), should be applied in satisfaction of such obligation. In keeping with this contention they, in the annual account, credited the community with all revenues, including those produced by the separate property, and then debited it (community) with the disputed disbursements. From appellee’s opposition to such method of accounting arises the question of whether or not the annuity or interest or rent charge is to be deducted from the revenues of the separate estate before the community realizes a profit therefrom.
 

 The community, according to Revised Civil Code Article 2402, consists of the profits of all the effects of which the husband has the administration and enjoyment. In Wilcox v. Henderson, 9 La.Ann. 347, .this court held that the fruits of the wife’s paraphernal property, under the administration of the husband, belonged to the community, but it must bear the charges of cul- • tivation as well as other incidental expenses. Succession of Boyer, 36 La.Ann. 506, is authority for the proposition that where the community has been credited with all of the revenues from the husband’s separate property it is chargeable with the taxes, repairs and insurance on the separate property thus enjoyed. In Courrege v. Colgin, 51 La.Ann. 1069, 25 So. 942, it is said:
 

 “* * * Where the husband, for the •community, cultivates a plantation, the separate property of the wife, the indebtedness incurred in such cultivation is a liability of the community, and the wife cannot be individually held for same. And this [certainly] includes the ordinary repair account of the plantation, by which the same is kept in a fair state of preservation, and deterioration prevented. * * * ”
 

 The court in Sharp v. Zeller, 110 La. 61, 34 So. 129, authorized the use of the rents from the husband’s separate property in the payment of a debt of the separate estate (interest due under a mortgage effecting the property), leaving the balance as profits for the community.
 

 The announced holdings of the cited cases have not been repudiated, and we know of no good reason why they should be. They appear to be thoroughly sound. Since the profits of the separate property, under the administration of the husband, fall into the community, it is but just, equitable and proper that the ordinary expenditures required in the production of such profits and in the preservation of the property should be borne by the community.
 

 The community receipts listed by the executors on their annual account, totaling in excess of $500,000, consist of the gross revenues of both the separate and ■community estates. The greater portion of that income, however, was derived from decedent’s separate property, the principal items of which were stocks and bonds. Many, if not most, of the stocks and bonds were acquired during- the marriage, of de
 
 *239
 
 cedent with his second wife, and her interest therein later became vested in him through their settlement agreement. In the acquisition of that interest, he, being without funds sufficient to consummate a cash transaction, was compelled to agree to pay an annuity or interest or rent charge for the privilege of deferring payment of the stipulated purchase price to an indefinite date. Had that agreement not been confected, or if after its confection the described interest or annuity or rent had not been paid, decedent’s separate estate would have been denied assets from which there was derived a great portion of the income listed by the executors on their annual account as receipts of the community. The logical consequence of this, it seems to us, is that the disbursements made in satisfaction of the charge should be deducted from the community receipts, they constituting nothing more than ordinary expenditures in behalf of the preservation of the separate estate from which the community income or profit was produced. Therefore, we hold that appellee’s opposition to the $35,500 item should have been overruled.
 

 Appellee, through her answer to the appeal, protests the overruling of her opposition to the executors^ deduction from the community receipts of donations made by decedent to his own blood relatives during their marriage.
 

 As shown by the annual account decedent’s gifts to his relatives amounted to $29,640.88. Also, it appears therefrom that members of his wife’s family received from him donations totaling $6,930.05. The charging to the community of the last mentioned donations is not questioned by opponent. Moreover, she concedes that under Revised Civil Code, Article 2404, a husband may donate specific community movables to anyone, barring fraud to injure his wife. Her position regarding the donations made by decedent to his relatives, to quote from the brief of her counsel, is as follows:
 

 “
 
 * •* * Ratcliff had a large separate estate; a smaller community estate. While he had considerable earnings for the community, yet during its existence he also received large amounts of cash through liquidation of property belonging' to his separate estate. The two were not kept separate. He did not keep books separately upon the community, and upon his separate estate, nor did his books evidence reciprocal accounting between the two funds. He had money belonging to Ernest Ratcliff; he had money belonging to Ernest and Helen Rat-cliff; the funds were commingled. Nothing on his books evidences an intention that any o.f these gifts should be paid from monies arising from one particular source or another. There is a complete dearth of proof in the record as to any intention on the part of Ratcliff that these gifts should be charged to the community. The question, therefore, is simply this: where one is in complete charge of two separate sources of revenue, and where the funds are utterly commingled, and where there is no proof of intention to dedicate any particular funds, are gifts to be charged to the fund owned by him jointly with another, or to his own. undivided fund when it is his own relatives solely who have benefitted ? * * * ”
 

 “ * * * We have conceded that donations made by Ratcliff without designation
 
 *241
 
 of the source of payment, are to be charged to the community when either his wife, or her relatives, were the beneficiaries. What we deny is that the gifts are to be considered as paid from community funds when the husband had greater separate funds of his own and the donation is to his own relatives and, therefore, to a cause from which neither the community nor the wife could possibly receive any benefit. We repeat: the power of the husband to donate from community movables is conceded. But where there is a separate estate and separate income, the presumption must evidently be, in the absence of express designation by the husband, that a donation to his own relatives is to be charged against his individual estate and not against that owned jointly with his wife, or with anyone else to whom he occupies a relation of trust and confidence.”
 

 If donations made by the husband without designation of the source of payment are properly charged to the community when relatives of the wife are the beneficiaries, it would seem that similar gifts to the husband’s kin should be charged likewise. Money given to one group could not redound to the benefit and success of the community any more than that given to the other. No basis in our jurisprudence for the suggested distinction has been found by ■us, and none has' been brought to our attention.
 

 Should a presumption exist with reference to the intention of decedent about the instant item, it, we think, would favor the charging of the disputed donations to the community rather than to the corpus of the separate estate. As pointed out above all of the net profits from decedent’s separate property belonged to the community, and it does not seem likely that he would have entertained the intention of ■ diminishing the invested capital that produced those profits.
 

 Since decedent had the power to make donations from the movables of the community, and since no fraud to the injury of opponent has been shown, we approve the district court’s holding that the donations to his relatives, made without expressing an intention that they be borne by his individual estate, should be chargeable to the community.
 

 The final opposition to be considered concerns the allocation of funds from certain improved rental property. It was overruled by the district court and is re-urged here by appellee in her answer to the appeal. Only a question of fact is involved.
 

 For some years prior to 1930 Mrs. Bessie R. Gray, daughter of decedent by his first marriage, received one-half of the net income from the mentioned improved property which she owned jointly with her father. During that year a new building was erected on the plot of ground, and thereafter no further revenues were paid to her.
 

 At the time of the death of Mr. Ratcliff his books disclosed that he had received during a period of years from the improved rental property income totaling $53,806.53. But the executors did not list that sum on their annual account as receipts of the com
 
 *243
 
 munity; instead they deducted therefrom a certain amount, maintaining that it was due and owing to Mrs. Gray as net income on her one-half interest in the property since 1935, and credited the community only with the balance. It is that deduction of which opponent now complains.
 

 It is not disputed that Mrs. Gray owned a one-half interest in the lot itself. As to why no rentals were paid to her after 1929, she testified that in 1930 her father, who handled all of her business affairs, explained that a new building was being erected for a tenant, Montgomery-Ward and Company; that all of her interest in the rentals during the existence of the lease (a ten-year period) with that tenant would be required to satisfy her share of the cost of the building; and that it was only six weeks before the trial of this case that she learned of the rentals having greatly exceeded the building’s cost.
 

 The building, according to the record, was entirely paid for from its net rentals in 1935. Mr. Webb, who was decedent’s secretary and "bookkeeper, had knowledge of that fact, and he also knew in 1935 or 1936, so he testified, that Mrs. Gray had an interest in the improved property. But under the instructions of Mr. Ratcliff he continued to credit the latter’s account with the entire income, the basis for such instructions being unknown to him.
 

 The trial judge, in overruling appellee’s opposition found as a fact from the evidence adduced that Mrs. Gray owned a half interest in the improved property; hence, he concluded that half of the rentals belong to her. That finding is amply sustained by the record, and certainly the conclusion drawn therefrom is correct.
 

 For the reasons assigned, the judgment of the district court is reversed and set aside insofar as it maintains the opposition to the item of $35,500 charged against the •community as interest paid, and that opposition is now overruled; in all other respects the judgment is affirmed. The costs of these proceedings in the district court shall be paid by the separate estate and the costs here by the community estate.
 

 O’NIELL, C. J., does not take part.