870 So.2d 626 (2004)
Betty ROAN, Nee Jackson, Plaintiff-Appellee,
v.
Billy J. ROAN, Defendant-Appellant.
No. 38,383-CA.
Court of Appeal of Louisiana, Second Circuit.
April 14, 2004.
*628 Blackwell, Chambliss, Law Firm by Sam O. Henry, III, West Monroe, for Appellant.
Albert E. Loomis, III, Mason L. Oswalt, Monroe, for Appellee.
Before WILLIAMS, CARAWAY and MOORE, JJ.
MOORE, J.
After receiving medical treatment for two strokes, Betty Roan returned home *629 functionally impaired and unable to resume her previous domestic regimen. Six months later, she moved out of the matrimonial domicile and subsequently petitioned for divorce, ending the six-year marriage. An interim judgment awarded her interim support, possession of the matrimonial domicile and a Suburban truck, and required her husband, Billy Roan, to maintain her insurance. Without considering any evidence, the court provisionally fixed interim support at $1400 per month, plus insurance payments, with the proviso that any future support award based upon the law and evidence would be the appropriate amount for the period of the entire interim award, and any credit or debit would then be applied.
The judgment of divorce was followed by a lengthy trial over the incidental matters. The court rendered judgment with written reasons dividing the community and awarding Ms. Roan permanent spousal support of $750 per month, with the start of permanent support and end of interim support to be set after a contradictory hearing. Both parties moved for a new trial. The court denied the motions, except to amend its judgment as to an IRA, and rendered judgment extending the interim support award of $1400 and insurance payments for a total period of 22 months until the final judgment was rendered. Following this ruling, Mr. Roan filed a supplemental motion for new trial claiming newly discovered evidence relevant to the partition. Ms. Roan also filed another motion for new trial. The court denied both motions. Mr. Roan now appeals. We amend the judgment, and as amended, affirm.

FACTS
Betty and Billy were married on March 17, 1994, his second marriage and her fourth. The couple met while Betty, then age 51, was employed as an RN at Union General Hospital in Farmerville, Louisiana. Mr. Roan, then 64, was the sole proprietor of a heating and air conditioning business.
There was discord early in the marriage. The Roans separated in October of 1994, but reconciled near the end of the following summer after Mr. Roan filed a petition for divorce. Upon reconciliation, they purchased a house at 152 Comanche Trail, West Monroe, Louisiana, and a lot on Lake D'Arbonne located on Wildwood Road in Union Parish.
In July of 1999, Ms. Roan suffered two strokes and remained hospitalized for 13 days. After treatment and therapy, she returned to the matrimonial domicile. The extent of her recovery and functionality was disputed at trial and in this appeal.
Ms. Roan moved out of the house in February of 2000.[1] She alleged she moved out due to stress arising out of pressures from Mr. Roan for sexual intimacy and his verbal cruelty. Mr. Roan alleged she moved out because of anger over his decision to retire and give his air conditioning and heating business to his son who was in the same business.
On August 3, 2000, Ms. Roan filed a petition for divorce pursuant to La. C.C. art.102, alleging that she intended to file a rule for final divorce 180 days after service of the petition. She alleged that she and Mr. Roan had lived separately since early February of 2000, and since that time she had resided in the matrimonial domicile located at 152 Comanche Trail. Ms. Roan *630 requested that the court award her exclusive use and occupancy of the home pending partition of the community property, interim and permanent spousal support, and partition of the community property pursuant to La. R.S. 9:2801 et seq.
Mr. Roan answered the petition, denying that Ms. Roan was entitled to or even needed interim spousal support because she had withdrawn all funds from the joint checking account and had charged $7300 against the joint Visa account. Additionally, Mr. Roan alleged that Ms. Roan received social security benefits and owned considerable separate property that enabled her to maintain her standard of living.
Mr. Roan filed a reconventional demand alleging that the couple had lived separate and apart for 180 days and that he was entitled to a divorce pursuant to La. C.C. art. 103. He also alleged that he purchased the matrimonial domicile at 152 Comanche Trail with his separate funds; thus he, and not Ms. Roan, should be granted exclusive use and occupancy of the home. Mr. Roan also requested a partition pursuant to La. R.S. 9:2801 et seq.
The court, Judge John Harrison presiding pro tempore, rendered an interim order on November 16, 2000 awarding Ms. Roan temporary interim spousal support of $1400 per month beginning November 1, 2000. At this hearing, the court stated:
[T]his interim support figure is fixed by the Court without any substantial consideration of the evidence and shall be without prejudice to both sides in the fixing or declining to fix of any future awards of spousal support if ... at a future time the Court fixes spousal support, that award shall serve to be the appropriate amount because that's going to be fixed on the evidence and law and that will be the appropriate amount for the full period of the interim spousal support award and the appropriate party at that time will receive a credit credits will be made at that time in favor of the party who is entitled to the credits.
The interim judgment also required Mr. Roan to maintain the insurance, and both parties were enjoined against abuse, harassment, alienation and encumbering. Subject to the same stipulation quoted above, the court awarded Ms. Roan occupancy of the home and use of the Suburban.
Trial was held on March 9, 13, 14, 15 of 2001, and on January 7, 8, 9, 10, and 11 of 2002 before Judge Sharon Marchman.
A judgment of divorce was granted in favor of Mr. Roan on March 9, 2001, and the community of acquets and gains was dissolved retroactively to the date of Ms. Roan's original 102 divorce petition, August 3, 2000.[2] Judgment on the incidental matters, including interim and final spousal support, was withheld pending further proceedings.
After trial, the court rendered judgment with extensive written reasons on the partition of the community and rule for permanent spousal support on September 10, 2002. Judgment was signed on October 15, 2002. The judgment partitioned the community and ordered Mr. Roan to pay $750 per month permanent spousal support. The court did not fix a date to terminate interim support and start permanent *631 support, stating that this issue would be determined after a contradictory hearing.
Both parties moved for a new trial on several issues. The court denied the motions, except to amend its judgment regarding an IRA, and rendered judgment extending the interim support award of $1400 and husband's obligation to make home and vehicle insurance payments until September 9, 2002, for a total period of 22 months. Mr. Roan subsequently filed a supplemental motion for new trial, alleging that Ms. Roan withheld evidence of a secret bank account only recently discovered. Ms. Roan also filed another motion for new trial. The court denied both motions.
Mr. Roan now appeals, alleging several assignments of error:
(1) The trial court erred in finding Ms. Roan legally free from fault.
(2) The trial court erred in fixing permanent spousal support at more than one-third of Mr. Roan's net income.
(3) The court erred in awarding terminated spousal support and disallowing Mr. Roan a credit for overpayment.
(4) The court erred in awarding Ms. Roan one-half of principal payments of Mr. Roan's business debts incurred before marriage but paid during the community regime.
(5) The court erred in accepting Ms. Roan's assigned values on an amended descriptive list of household movables without any evidence of their value, while rejecting Mr. Roan's assigned values.
(6) The court erred in denying a new trial to consider evidence of a savings account belonging to Ms. Roan discovered after trial.

DISCUSSION: FAULT

By his first assignment, Mr. Roan contends the trial court erred in finding that Ms. Roan was free from fault. Mr. Roan alleged that Ms. Roan abandoned him in February of 2000 when she moved out of the matrimonial domicile without lawful cause and refused to return. This abandonment, he argued, constituted legal fault and precluded an award of permanent spousal support. The trial court concluded, however, that Ms. Roan's fears regarding her health if she remained in the matrimonial domicile were justified by her medical condition and Mr. Roan's actions after the stroke. Accordingly, the court found that Ms. Roan was not at fault for the physical separation leading to dissolution of the marriage. Mr. Roan contends that the trial court's conclusion that Ms. Roan was free from fault was clearly wrong.
Fault is a threshold issue in a claim for spousal support. In a proceeding for divorce or thereafter, the court may award interim periodic support to a party or may award final periodic support to a party free from fault prior to the filing of a proceeding to terminate the marriage, based on the needs of that party and the ability of the other party to pay. La.C.C. art. 111. The burden of proof is upon the claimant. Lyons v. Lyons, 33,237 (La.App. 2 Cir.10/10/00), 768 So.2d 853, writ denied, XXXX-XXXX (La.1/5/01), 778 So.2d 1142.
Revision Comment (c) of 1997 to La. C.C. art. 111 notes that fault continues to mean misconduct that rises to the level of one of the previously existing fault grounds for legal separation or divorce. Jones v. Jones, 35,502 (La.App. 2 Cir. 12/5/01),804 So.2d 161; Allen v. Allen, 94-1090 (La.12/12/94), 648 So.2d 359. Fault that precludes an award of spousal support must have occurred prior to the filing of the action for divorce, in this case, August *632 3, 2000. Legal fault may include, among other actions, habitual intemperance or excesses, cruel treatment or outrages, and abandonment. Mayes v. Mayes, 98-2228 (La.App. 1 Cir. 11/5/99), 743 So.2d 1257, 1259. A spouse who petitions for permanent support need not be totally blameless in the marital discord. Only misconduct of a serious nature, providing an independent contributory or proximate cause of the breakup, equates to legal fault. Lyons v. Lyons, supra.
The trial court has vast discretion in matters regarding determination of fault for purposes of precluding final periodic support. The trial judge's finding of fact on the issue of fault will not be disturbed unless manifestly erroneous. Lyons v. Lyons, supra. Even though an appellate court may feel its own evaluations are more reasonable than the factfinder's, reasonable evaluations of credibility should not be disturbed where conflict exists in testimony. Carr v. Carr, 33-167 (La.App.2 Cir.4/5/00), 756 So.2d 639.
Mr. Roan contends that Ms. Roan abandoned him when she moved out of the matrimonial domicile, and this abandonment caused the dissolution of the marriage. Abandonment was a ground for separation under former La. C.C. art. 138, and still constitutes legal fault for the purpose of preclusion of a party from permanent spousal support. See Caldwell v. Caldwell, 95-963 (La.App. 5 Cir. 3/13/96), 672 So.2d 944, writ denied 96-1550 (La.9/27/96) 679 So.2d 1351. The elements necessary to prove abandonment as provided in the former code articles are:
1. the party has withdrawn from the common dwelling;
2. the party left without lawful cause or justification; and
3. the party has constantly refused to return to live with the other.
In this instance, the trial court concluded that Ms. Roan was without fault because she was justified in leaving the matrimonial domicile. This finding was based upon the court's evaluation of extensive testimony by the parties, Dr. Karen Beene, and several lay witnesses.
Ms. Roan moved out of the matrimonial domicile on February 12, 2000. She testified that she left because Mr. Roan was putting too much pressure on her, and she was depressed in the same way as she was prior to her strokes. She said he expected her to do things she was not capable of doing, which caused stress. Although Mr. Roan did not complain to her about cooking or cleaning, she said he expected their sexual relationship to return to normal. She described Mr. Roan as a man with two personalities, one nice and loving and the other verbally and emotionally cruel. She said he would put her down in front of others, although he did not believe he had done so. She believed that she would die from a recurrence of the stroke if she did not leave him.
Mr. Roan argues that Ms. Roan moved out because of anger over his decision to retire and give his air conditioning business to his son Tim, whom he says she did not like. He testified that she pressured him from the very beginning to make out a will and to make her executrix. He said she did not want him to divide his property between his children and her family. Rather, he said she wanted it all for her family.
Mr. Roan testified that at the time Ms. Roan had the strokes, they were not sleeping in the same bedroom. The house had three bedrooms; Ms. Roan's daughter, April, and granddaughter, Kelsa, lived with them. He recalled that she had moved to a separate bedroom two or three weeks prior to the stroke.
*633 Contrary to the testimony of Ms. Roan's daughters, who testified that he came to the hospital only twice during Ms. Roan's 13 days of treatment, Mr. Roan said he visited the hospital once or twice every day. He admitted that he was not interested in the percentages of brain damage his wife suffered; rather, he stated his only concern was with helping her. He acknowledged that he did not discuss with the treating physician, Dr. Beene, the matter of sexual relations with Ms. Roan, but indicated that Ms. Roan initiated sexual relations on the night she returned home and two or three times thereafter during her first month back home.
After the stroke, Ms. Roan asked Mr. Roan to hire Melissa McQuillan to sit with her five days per week, which he did. That fall, he said he decided to get out of the air conditioning and heating business in order to take care of Ms. Roan, so he planned to turn the business over to his son, Tim, at the beginning of the year. Mr. Roan testified his wife grew more distant toward him after the new year. He did not know why Ms. Roan left him in February the weekend prior to the Super Bowl, but speculated it may have been because of his decision to retire from the heating and air conditioning business.
About six weeks after she left, Mr. Roan was approached by his daughters about letting Ms. Roan stay in the matrimonial domicile without him. He agreed to do so on the condition that he be given a notarized affidavit stating that he was not abandoning her. Mr. Roan admitted that he never asked Ms. Roan to return to the matrimonial domicile.
In its written reasons for judgment, the trial court expressed its belief that both Mr. Roan and Ms. Roan were exaggerating their behavior and treatment toward each another, and concluded that the evidence did not rise to the level of legal fault on the part of either party. However, the court found the testimony of Dr. Beene, a neurologist specializing in strokes, to be very persuasive.
Dr. Beene testified that she treated Ms. Roan for two stroke incidents, one involving the left side and the other the right side of the brain. She said that the first stroke caused damage to 20% of the left occipital portion of the back of her brain. This damage affected Ms. Roan's ability to recognize objects within the right visual field of both eyes. Although objects are present in the image field or vision field created by her eyes, the brain simply does not register or notice them.
Regarding the second stroke, Dr. Beene stated that a stroke on the right side of the brain can cause some paralysis on the left side of the body, and often patients will fail to recognize their left arm as their own. She also said the right side of the brain is involved in coordinating thought and putting thoughts and plans into motion. She related this type of damage to Ms. Roan's reported short-term memory loss and to the results of an examination she performed in her office shortly before trial.
Dr. Beene examined Ms. Roan one week before trial and tested her ability to perform ordinary RN functions, such as taking blood pressure, measuring pulse, weighing a patient, and administering an intramuscular injection with a syringe. Dr. Beene stated that Ms. Roan could not properly adjust the scales, and weighed her incorrectly. Ms. Roan reported incorrect measurements of blood pressure and pulse. She instructed Ms. Roan to give her a shot of 5 cc's normal saline. Ms. Roan put the needle in the syringe appropriately and cleaned Dr.Beene's arm with an alcohol pad, but next attempted to give the injection with an empty syringe. She also left her purse and her glasses when she left the examination room. Although *634 the test was administered shortly before trial, Dr. Beene testified that she did not believe Ms. Roan was fabricating her lack of ability to perform these ordinary nursing duties.
Dr. Beene concluded from these tests that Ms. Roan was functioning at the level of an 8 to 10 year old child, and thus could not be left alone for any length of time.[3] Although Ms. Roan might appear normal socially, when she is asked specific questions or tested, the damage from the stroke becomes apparent, according to Dr. Beene. She opined that Ms. Roan would suffer stress and become upset if her "primary caretaker and live-in partner ... made verbal demand and expressed the... thought that the sexual life ought to continue as it was before," or her "performance level ... ought to remain at or near the same in terms of food preparation, cleaning of the house, assisting in domestic chores....". Dr. Beene also testified that she could recall only two conversations with Mr. Roan while she was in the hospital.
Dr. Beene's observations were corroborated by other lay witnesses. Melissa McQuillan was hired by Mr. Roan to sit with Ms. Roan during the day. She described Ms. Roan as being very forgetful in that she misplaced things and forgot to turn appliances or water off. She would frequently get lost or not remember where she was going. Patricia Ross, a friend of the Roans for three years, testified that after the stroke Ms. Roan was often confused. She described occasions in which Ms. Roan was upset over verbal abuse from Mr. Roan.
In this case, the trial court concluded that, given Ms. Roan's condition and impairments described in the testimony of Dr. Beene and others, Ms. Roan's subjective feelings of pressure and her fears of death from a new stroke were reasonable, and she was justified in leaving the matrimonial domicile. We note also that Mr. Roan did not ask Ms. Roan to return to the matrimonial domicile. Accordingly, we find no error in the trial court's finding that Ms. Roan was without fault.

AMOUNT OF FINAL PERIODIC SUPPORT
By his second assignment, Mr. Roan contends the court erred in fixing permanent spousal support at more than one-third of his net income.
Once freedom of fault is established, the basic tests for the amount of spousal support are the needs of that spouse and the ability of the other spouse to pay. La. C.C. arts. 111, 112; Carr v. Carr, supra. The award for final periodic spousal support is governed by La. C.C. art. 112, which requires the court to consider all relevant factors. The nine specific factors listed in C.C. art. 112 are not exclusive. Article 112 also limits the amount to not exceed one-third of the obligor's net income. The trial court is vested with great discretion in making post-divorce alimony determinations, and its judgment will not be disturbed absent a manifest abuse of discretion. Carr, supra.
The earning capacities of the parties, their age, and the duration of the marriage are relevant factors listed in La. C.C. art. 112. The relative financial positions of the parties and the standard of living during the marriage are not listed in C.C. art. 112 but can be relevant factors. As stated above, all relevant factors are to be considered and the court is not limited to those specifically listed in the code article. *635 Knowles v. Knowles, 02-331 (La.App. 3 Cir.10/2/02), 827 So.2d 642. The trial court is vested with much discretion in determining awards of spousal support. Such determinations will not be disturbed absent a clear abuse of discretion. McDermott v. McDermott, 32,014 (La.App. 2 Cir.6/16/99), 741 So.2d 186; Broussard v. Broussard, 532 So.2d 281 (La.App. 3 Cir.1988).
Mr. Roan argues that the award of $750 per month in final periodic support is excessive given his age, now 73, and his wish to retire. He contends that this amount exceeds one-third of his net monthly income, as his projected annual after tax net income is approximately $24,000. He arrived at this sum based upon social security income of $1469 per month, rental income of $725 per month and interest and dividend income from investments totaling $9000 per year. Mr. Roan testified that he is retired and no longer in business, having given his heating and air conditioning business to his son, Tim.
The trial court concluded that, although Mr. Roan was 70 years old at the time of judgment, he was a vigorous man capable of continuing to work. The court believed that he, in fact, had continued to work on heating and air conditioning jobs. The court noted that Judy Hollis, Mr. Roan's accountant, testified that Mr. Roan received approximately $2600 per month in rental income from buildings and vehicles. This amount appears to be rental payments from Tim Roan to his father for the building and vehicles.
Our review of the record, as also noted by the trial court, reveals that Mr. Roan possesses considerable financial assets and is involved in several business ventures. The trial judge noted that the troubled marriage was not long-lived and she was cognizant of Mr. Roan's age, but she expressed the view that he was vigorous and healthy compared to the younger Ms. Roan, who was left impaired by the stroke and unable to work. The court observed that Mr. Roan possesses the ability and knowledge to produce considerable income. On this record, we perceive no abuse of discretion and decline to disturb the trial court's determination.

TERMINATION OF INTERIM SPOUSAL SUPPORT
By his third assignment, Mr. Roan complains that the court erred when it extended interim spousal support one year beyond 180 days after the judgment of divorce rendered on March 9, 2001. The court ordered Mr. Roan to pay interim spousal support of $1400 per month and continue making the insurance payments, all totaling $1889, for the 22 month period from November 1, 2000 until rendition of judgment awarding permanent periodic spousal support on September 10, 2002.
Louisiana Civil Code article 113 provides:
Upon motion of a party or when a demand for final spousal support is pending, the court may award a party interim spousal support allowance based on the needs of that party, the ability of the other party to pay, and the standard of living of the parties during the marriage, which award of interim spousal support allowance shall terminate upon the rendition of a judgment awarding or denying final spousal support or one hundred eighty days from the rendition of judgment of divorce, whichever occurs first. The obligation to pay interim spousal support may extend beyond one hundred eighty days from the rendition of judgment of divorce, but only for good cause shown. (Emphasis added).
The purpose of interim spousal support is to maintain the status quo without *636 unnecessary economic dislocation until a final determination of support can be made and until a period of time of adjustment elapses that does not exceed, as a general rule, 180 days after the judgment of divorce. Defatta v. Defatta, 32,636, 32,637 (La.App. 2 Cir.2/1/00), 750 So.2d 503;
Reeves v. Reeves, 36,259 (La.App. 2 Cir.7/24/02), 823 So.2d 1023. Under Article 113, a trial court may award an interim support allowance based on the needs of the party claiming it and the other party's ability to pay, considered in light of the standard of living enjoyed by the parties during marriage. The trial court is afforded much discretion in determining an award of interim spousal support and that award will not be disturbed absent a clear abuse of discretion. Id.
The divorce was granted on March 9, 2000. Pursuant to Article 113, interim spousal support terminated by operation of law 180 days after March 9, 2001, or September 9, 2001, unless extended for good cause. Ms. Roan did not file a motion or rule to extend the obligation beyond September 9, 2001.[4] The record does not show that the court made a finding of "good cause" for extending interim support until nearly 18 months after that termination date. After a contradictory hearing held on January 14, 2003 in which it took the matter under advisement, the court, on February 11, 2003, retroactively extended interim support one year until September 10, 2002, the date of final judgment. The court stated that Mr. Roan's failure to timely provide some financial documents pursuant to legitimate discovery requests had delayed trial and this constituted "good cause" to extend the interim spousal support. By extending the interim support award one year, Mr. Roan thus paid an additional $22,668 in interim support.
We note that the initial court award by Judge Harrison, sitting pro tem by appointment, provisionally fixed the interim support award at $1400 and required Mr. Roan to maintain insurance for Ms. Roan. However, the court stipulated that any future award based on the law and evidence would be the appropriate amount for the full period of the interim award. He specified that any credits would then be given to the party entitled to such credits. Although the ruling appears to mean that the final support award will retroactively apply as the interim award, the record contains a letter from Judge Harrison dated January 9, 2003, submitted as a joint exhibit at the January 14, 2003 contradictory hearing to determine the termination date of interim support. See Exhibit NT-2. In that letter, Judge Harrison stated that he did not recall his discussions with counsel regarding the interim support ruling, but he did not believe that he intended to rule on whether any permanent spousal support award would be applied retroactively.
We have reviewed the transcripts of the proceedings in this matter. Trial of this case was originally scheduled for March 9, 13, 14 and 15. On February 27, Mr. Loomis, counsel for Ms. Roan, filed a motion to continue the trial alleging two grounds: (1) that the four days scheduled for trial was not enough time to try all of the case, and (2) that Mr. Roan had not filed his descriptive list and still owed some financial records subpoenaed in connection with an earlier deposition. Mr. Loomis asked the court to re-schedule the *637 trial for at least one month, if not two months.
In turn, Mr. Henry, counsel for Mr. Roan, filed a motion for a protective order, contending that the plaintiff had just served the subpoena for the requested documents on February 28, 2001, which was beyond the discovery completion deadline of 15 days before trial.[5] He argued that the request was unduly burdensome and expensive and filed for purposes of annoyance or oppression. He also filed a motion to bifurcate the trial to determine the fault issue.
Trial began on March 9, 2001 as scheduled. The issue of fault and permanent spousal support were taken up and tried over March 9, 13, 14, and 15, but not completed. The issue of the partition of community property was not tried. Near the end of the week of testimony, both sides accused the other of failing to produce certain documents requested in discovery. Mr. Loomis wanted Mr. Roan's tax return for the year 2000, which, as of that date in March of 2001, he had not completed and filed with the IRS, and he also wanted some recent investment brokerage statements. Mr. Henry asked for additional financial documents from Ms. Roan. The court ordered the parties to comply with the discovery requests and scheduled trial to continue on August 27, 2001, five months later. The court specifically ordered respective counsel to address any discovery issues prior to trial.
When court convened on the morning of August 27, 2001, the court noted that it was again faced with discovery disputes that were not raised by Mr. Loomis until the day of trial. Mr. Loomis sought a continuance because Mr. Roan had not provided the 2000 tax return until that day and other information was allegedly missing. The court admonished Mr. Loomis for bringing this matter up on the day of trial, stating that it did not leave the court any options except to grant his request for a continuance. The court stated that due to its current scheduled docket, it likely could not re-schedule trial again until January of 2002.
Mr. Henry opposed the continuance, stating that he was unaware that there were any documents missing until that morning. He also complained that Ms. Roan had also failed to produce requested bank statements, and he was unable to ascertain the status of her social security claim.
The court ordered Mr. Henry to produce all missing documents by 5:00 p.m. that day and to make the matrimonial home available for an appraisal that day. The court ordered both sides to fax a list of deficiencies to each other by 5:00 p.m. that day if anything was missing. In the event of a deficiency, they were instructed to file motions for contempt to be heard that Friday, August 31.
No motions for contempt were filed. Trial was set the following month via telephone status conference for the week beginning January 7, 2002. Trial was held on January 7, 8, 9, 10, and 11. Evidence on the issue of spousal support was finally closed on January 9, and the remaining issue of partition was taken up and tried. Written reasons for judgment were rendered nine months later, on September 10, 2002.
At the outset, we note that the appropriate procedure to deal with delinquent discovery compliance is to file a motion for an *638 order compelling discovery pursuant to La. C.C.P. art. 1469 or 1469.2 (financial records) and, if not complied with, to request sanctions pursuant to La. C.C.P. art. 1471, which provides that the court may award reasonable expenses, including attorney fees, for the failure to comply with an order compelling discovery.
Our review of the record does not support a finding that the delay in trial was caused solely by Mr. Roan. Both parties complained that the other had failed to timely comply with discovery, although Mr. Roan was dilatory concerning more documents. Mr. Loomis certainly raised the issue more. Nevertheless, Mr. Loomis stated at the outset of trial on March 9, 2001 that he could not try the case in the four days scheduled. He asked for a continuance on that ground, as well as the alleged discovery deficiencies by Mr. Roan. The court granted a continuance until August 27, 2001. On that date, Mr. Loomis again moved for a continuance alleging that Mr. Roan had failed to provide necessary documents until the day of trial, even though the discovery cut-off was 30 days earlier. Again, the court noted that counsel had not brought the matter to the court's attention until the day of trial. Mr. Loomis did not file any motions to compel or for sanctions prior to the trial date. Lacking any alternative, the court stated that it had no other choice than to grant the continuance. Importantly, the court noted that the next available trial date was not until January of 2002. We observe, however, that the court's future docket was a factor over which Mr. Roan had no control, and introduces an element of arbitrariness in the court's decision to hold him responsible for the length of the delay.
Accordingly, we conclude that the "good cause" stated by the trial court for extending the interim support award is excessively punitive and constitutes an abuse of discretion. We do not think that the legislature intended interim support provisions of Article 113 to be used as a remedy or punishment for dilatory discovery responses. Although the Civil Code and Comments are silent as to what factors constitute "good cause," the mandatory language of the statute signifies that the "good cause" requirement is not a mere formality, but is a plainly expressed limitation of the interim support authorized by that article.[6]
There is thus far in our law scant jurisprudence on what constitutes "good cause" to extend interim spousal support. In Lang v. Lang, 37,779 (La.App. 2 Cir. 10/23/03), 859 So.2d 256, we affirmed the ruling of the trial court that denied the former wife's motion to extend interim spousal support beyond the judgment of divorce where it found that the wife seeking an extension of spousal support was able to support herself.
In Piccione v. Piccione, XXXX-XXXX (La. App. 3 Cir. 5/22/02), 824 So.2d 427, the third circuit affirmed a trial court's ruling that denied Ms. Piccione's request to extend the award of interim child support until the time the youngest child reaches school age. Ms. Piccione argued that it was the intention of the parties that she not work until both children were in school, and that she was entitled to an extension of interim support for good cause shown under La. C.C. art. 113. The court endorsed the following statement regarding "good cause" by the trial court in its written reasons for ruling: "It is the understanding of this court that `good *639 cause' must constitute, if not a compelling reason, certainly a reason of such significance and gravity that it would be inequitable to deny an extension of such support." The court of appeal went on to say:
Whether "good cause" exists for the extension of interim support must be determined on a case-by-case basis. The disability of the claimant spouse or a situation where a claimant spouse is prevented from seeking employment due to circumstances beyond his or her control might be "good cause" to extend interim support. We do not find that an alleged agreement that the claimant spouse would stay home until the children entered school satisfies the good cause requirement of Article 113. We find no error in the court's denial of Ms. Piccione's request to extend interim support.
Undoubtedly it is difficult to define "good cause" in such a manner that it will provide clear guidelines for the solution in all cases. We therefore agree with the third circuit that "good cause" must be determined on a case-by-case basis and must constitute, if not a compelling reason, certainly a reason of such significance and gravity that "it would be inequitable to deny an extension of such support." The good cause showing of Article 113 requires an affirmative showing by the party seeking an extension of interim support that the extension is really and genuinely needed, and the purpose for which it is sought is legitimate, not calculated to cause hardship or to obtain as much spousal support as possible for as long as possible.
In this case, there was no showing of "good cause" for extending the interim support award beyond 180 days after the March 9, 2001 judgment of divorce. For these reasons, we hold that interim spousal support terminate 180 days after the March 9, 2001 judgment of divorce. Ms. Roan did not file a motion showing good cause to extend interim spousal support beyond the 180-day period provided by the statute, a requirement of which her counsel should have been aware. Although Ms. Roan contends that the interim award was continued in effect by the trial court's orders extending Judge Harrison's interim orders, the trial court is without authority to extend the interim award without the statutorily mandated "good cause" showing.
We further conclude that the trial court abused its discretion in concluding that any delay caused by incomplete discovery constituted "good cause" to retroactively extend interim spousal support for one year. Accordingly, we amend the judgment of the trial court that extended interim spousal support one year. Interim support terminated on September 9, 2001.
We further amend that part of the trial court's judgment that started permanent spousal support on September 10, 2002 to commence one year earlier on September 10, 2001. Thus, Mr. Roan is entitled to a credit or reimbursement of $22,668, off-set by $9000 ($750 X 12 = $9000), for a net credit of $13,668.

REIMBURSEMENT OF COMMUNITY FUNDS
By his fourth assignment, Mr. Roan complains that the trial court erred by reimbursing Ms. Roan $25,326.66, an amount representing one-half of community funds used to pay two specific balance sheet liabilities or debts of Roan Heating and Air Conditioning.[7] The court concluded that these liabilities that existed at the *640 time of the marriage were Mr. Roan's separate debts satisfied out of community funds. Mr. Roan contends that the liabilities in question constituted debts for equipment and inventory of heating and cooling units that were subsequently used up or sold to customers, e.g, as installed air conditioners and heating units. Hence, he argues, these were not debts pertaining to fixed assets that inured to the benefit of Mr. Roan's proprietorship for which reimbursement is owed. Instead, these items constituted operating expenditures used to produce community income shared by Ms. Roan, and as such, he owed no debt to the community. Succession of Ratcliff, 209 La. 224, 24 So.2d 456 (1945).
At the time of the marriage, Mr. Roan owned two businesses, Roan Rental Properties and Roan Heating & Air Conditioning. Mr. Roan decided to retire from his air conditioning business effective December 31, 1999, and he sold the business to his son for one dollar, although he continued to work and receive money into the year 2000 and perhaps beyond. Mr. Roan testified that he still owns the building used in the business, and he gave his son the four old trucks and customer list. There was no inventory.
Viewing the financial statements submitted into evidence, the court found that the building and improvements were valued at $108,426.50, and the lot was valued at $12,500, all of which belonged to Mr. Roan at the time of the marriage. The court found that the property was mortgaged at the time of the marriage, and community income was used to pay off the mortgage. Ms. Roan argued that the value of the business including the assets above was $146,000, but the court rejected Ms. Roan's claim for one-half the value of the business.
As listed liabilities on the balance sheets of Roan Air Conditioning & Heating in 1994, the debts in question totaled $50,653.32. The total balance sheet liabilities at the time, however, totaled over $100,000. The 1994 financial statements listed the company's net worth or total equity as approximately $45,000. By 1999, when Mr. Roan gave the business to his son, the net worth of the business was approximately $146,000, and the debts in question were paid. The only liabilities of the company were de minimis, including some federal and state taxes and accounts payable.
Based upon our review of the record we cannot say that the trial court manifestly erred in concluding that Mrs. Roan is entitled to reimbursement for one-half of these two debts paid by the community. It was Mr. Roan's burden at trial to show that these liabilities represented operating expenses. Our review of the record by no means demonstrates that these liabilities arose from and were paid as operating expenses. The record is further clouded by the fact that Mr. Roan sold the business for one dollar, giving his son the equipment, while continuing to work and collect accounts receivable. The record is clear, however, that the liabilities in question existed on the balance sheets at the time of the marriage as Mr. Roan's separate debts and were eliminated when the business shut down on December 31, 1999. La. C.C. art. 2364.
We conclude, therefore, that this assignment is without merit.

VALUES IN DESCRIPTIVE LIST
By his fifth assignment, Mr. Roan contends that the court abused its discretion by accepting an amended and reduced valuation of household items in the descriptive list supplied by Ms. Roan. The change in valuation was from $16,450 to $3,435, reducing the assigned values by more than $13,000. The court stated that *641 it found the values assigned by Ms. Roan to be reasonable. Mr. Roan contends that the court's acceptance of Ms. Roan's amended valuation over the previous valuation to which the parties agreed was arbitrary since there was no evidence as to valuation, and noted that it was initially Ms. Roan who filed the higher-valued descriptive list, to which Mr. Roan agreed The result of the change was to increase Mr. Roan's equalizing payment to Ms. Roan.
In community property partitions, the trial court is granted much discretion in valuing and allocating assets and liabilities and is required to consider the source and nature of each asset or liability, the financial situation of the other spouse, and any other relevant circumstances. La. R.S. 9:2801 et seq.; Bedenbender v. Bedenbender, 28,579 (La.App. 2 Cir. 8/21/96), 679 So.2d 506. Given this great discretion, the trial court is not required to accept at face value a spouse's valuation of assets or debts, or claims against the community. Bedenbender, supra. An appellate court may not set aside a trial court's factual findings absent manifest error or unless clearly wrong. Ball v. Ball, 32,851 (La. App. 2 Cir. 3/1/00), 757 So.2d 824; Stobart v. State, 617 So.2d 880 (La.1993).
Ms. Roan argues that the values placed on the original descriptive list were based on the purchase price and did not reflect the current (depreciated) value. Mr. Roan testified that the furniture items were as good as new and based on what they paid for them.
Based on this record and the general lack of evidence to determine the actual value of the items in the descriptive list, we cannot say that the trial court abused its discretion in accepting the reduced valuation of the items because there is no evidence in the record that the values assigned were clearly wrong.

NEWLY DISCOVERED EVIDENCE OF SAVINGS ACCOUNT
In his final assignment, Mr. Roan alleges that after trial he received a quarterly statement of account in Ms. Roan's name from Hartford Life Insurance Company. He alleges that this was an investment account established through her former employer, Union General Hospital, and the account balance of $4,808.92 is community property. Mr. Roan contends that the trial court erred in denying its supplemental motion for new trial as the wrong procedural vehicle to bring this evidence before the court.
La. C.C.P. art.1974 states:
The delay for applying for a new trial shall be seven days, exclusive of legal holidays. The delay for applying for a new trial commences to run on the day after the clerk has mailed, or the sheriff has served, the notice of judgment as required by Article 1913.
Judgment was signed on October 14, 2002 and notice of judgment sent on October 15, 2002. Mr. Roan timely filed his first motion for new trial on October 24, 2002. A contradictory hearing to set the date for termination of interim support and other matters was held on January 14, 2003, and on February 11, 2003, the court ruled from the bench. A written judgment was signed on April 1, 2003. Mr. Roan filed a supplemental motion for new trial on March 24, 2003, a week before the April 1 judgment was signed.
Ms. Roan contends the motion is untimely because the delays for filing a motion for new trial had passed when Mr. Roan filed the supplemental motion. Mr. Roan counters that since the court had not signed a judgment on the first motion for new trial, the supplemental motion was timely. We disagree.
*642 The supplemental motion for new trial was untimely as to the original judgment. The delay for filing a motion for new trial runs from the date the original judgment is signed. Bodenheimer v. Bodenheimer, 97-1118, 97-1119 (La.App. 5 Cir. 3/11/98), 709 So.2d 306, writ denied, XXXX-XXXX (La.5/15/98), 719 So.2d 469. The supplemental motion in this case was unrelated to the amended judgment signed a week later. A trial judge possesses no discretion or (equitable) power to extend the delay within which to apply for new trial. Gottsabend v. Aetna Cas. & Sur. Co., 273 So.2d 637 (La.App. 4 Cir.1973).

CONCLUSION
For the foregoing reasons, we amend that part of the judgment of the trial court that extended interim spousal support until September 10, 2002. Interim support ended 180 days after the date of divorce, or September 9, 2001. We further amend the judgment starting permanent spousal support on September 10, 2001. Accordingly, Mr. Roan is entitled to a credit or reimbursement of $13,668 for overpayment of terminated interim spousal support.
In all other respects, the judgment of the trial court is affirmed. Costs are assessed equally to Mr. and Ms. Roan.
AMENDED AND AS AMENDED, AFFIRMED.
NOTES
[1] She subsequently proposed that Mr. Roan allow her to live in the matrimonial domicile and he move out, which Mr. Roan accepted.
[2] Ms. Roan filed a petition for divorce under Civil Code article 102 on August 3, 2000 while Mr. Roan filed a reconventional demand for divorce under Civil Code article 103 on September 8, 2000. Civil Code article 102 permits a spouse to file a motion for final divorce after 180 days has elapsed when either spouse filed a petition for divorce under Civil Code 102.
[3] On cross examination, Dr. Beene somewhat recanted this characterization of Ms. Roan's functioning, stating that she did not mean mental capacity by this remark.
[4] At the end of trial proceedings on March 15, 2001, the court continued trial until August 27, 2001 and stated that Judge Harrison's previous orders would remain in effect. Trial was continued again on August 27, and the court stated that Judge Harrison's orders would remain in effect, but it did not specifically refer to interim support.
[5] The court later learned that the documents were requested at Mr. Roan's deposition some weeks earlier.
[6] Cases interpreting other statutes requiring showing of "good cause" hold that the showing is mandatory. E.g., cf. Carner v. Carner, 97-128 (La.App. 3 Cir. 6/18/97), 698 So.2d 34; Dugas v. Continental Cas. Co., 249 La. 843, 191 So.2d 642 (La. 1966).
[7] The court arrived at this figure by averaging the sum of the two debts on the February and March 1994 balance sheets. (See Exhibits D-9 and D-10).